UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JEFFREY DEMOSTHENE,                             Case No. 18 CV 1358
                              Plaintiff,        (ARR) (PK)

          -against-                             **THIRD AMENDED
                                                COMPLAINT**

THE CITY OF NEW YORK, DETECTIVE
KEVIN GOODSPEED [SHIELD # 3599],                JURY DEMAND
DETECTIVE ANTHONY PULEO [SHIELD
# 11428], DETECTIVE JOHN ROBERTS
[SHIELD # 3656], SERGEANT BRYAN
PIERRE [SHIELD # 4506], DETECTIVE
GARY HABER [SHIELD # 35754], and
JOHN DOE AND JANE DOE (the names
John and Jane Doe being fictitious, as the
true names are presently unknown),
                              Defendants.
-------------------------------------------------------------------X

Plaintiff, JEFFREY DEMOSTHENE, by his attorney, The Law Offices of UGO UZOH,

P.C., complaining of the defendants herein, The City of New York, Detective Kevin

Goodspeed [Shield # 3599], Detective Anthony Puleo [Shield # 11428], Detective John

Roberts [Shield # 3656], Sergeant Bryan Pierre [Shield # 4506], Detective Gary Haber

[Shield # 35754], and John Doe and Jane Doe (collectively, "defendants"), respectfully

alleges as follows:

1.       This is an action at law to redress the deprivation of rights secured to the
         plaintiff under color of statute, ordinance, regulation, custom, and/or to
         redress the deprivation of rights, privileges, and immunities secured to the
         plaintiff by the Fourth, Fifth, Sixth and Fourteenth Amendments to the
         Constitution of the United States, and by Title 42 U.S.C. §1983, [and arising
         under the law and statutes of the City and State of New York].

                                   JURISDICTION

2.       The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 28
         U.S.C. § 1343, 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and under the

Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

3.  As the deprivation of rights complained of herein occurred within the Eastern District of New York, venue is proper in this district pursuant to 28 U.S.C. §1391 (b) and (c).

COMPLIANCE WITH N.Y. GEN. MUN. LAW REQUIREMENTS

4.  Plaintiff timely made and served a notice of claim upon the defendants in compliance with N.Y. Gen. Mun. Law § 50-e.

5.  At least thirty days have elapsed since the service of aforesaid notice of claim and adjustment or payment thereof has been neglected or refused.

6.  This action is commenced within one year and ninety days after the happening of the event(s) upon which the claim(s) is based.

THE PARTIES

7.  Plaintiff is and was at all times material herein a resident of the United States and the State of New York.

8.  Defendant City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.

9.  The City of New York Police Department ("NYPD") is an agency of defendant City, and all officers referred to herein were at all times relevant to this complaint employees and agents of defendant City.

10.  Defendant Detective Kevin Goodspeed [Shield # 3599] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

11.  Defendant Detective Anthony Puleo [Shield # 11428] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

12.  Defendant Detective John Roberts [Shield # 3656] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

13.  Defendant Sergeant Bryan Pierre [Shield # 4506] was at all times material herein a sergeant employed by the NYPD. He is named here in his official and individual capacities.

14.  Defendant Detective Gary Haber [Shield # 35754] was at all times material herein a detective employed by the NYPD. He is named here in his official and individual capacities.

15.  Defendants John Doe and Jane Doe were at all times material herein individuals and/or officers employed by the NYPD and Queens County District Attorney's office ("QCDA"). They are named here in their official and individual capacities.

16.  Defendants Goodspeed, Puleo, Roberts, Pierre, Haber, and John Doe and Jane Doe are collectively referred to herein as "defendant officers".

17.  At all times material to this Complaint, the defendant officers acted towards plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York.

FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

The plaintiff's February 4, 2014 arrest

18.  On or about February 4, 2014, at approximately 9:00 a.m., defendant officers, acting in concert, arrested the plaintiff inside the New York State courthouse that is located at or within the vicinity of 265 East 161st Street, Bronx, New York.

19.  It appears that the plaintiff was arrested in connection with the August 31, 2013, murder of a young man named Najee Simmons.

20.  Prior to the arrest, plaintiff had entered an appearance in the New York State Supreme Court, County of Bronx, on an unrelated criminal matter.

21.  At all times material, and upon information and belief, the defendant officers conducted investigations over a period of time into the aforesaid murder.

22.  Several NYPD police officers were involved in the investigations.

23.  Goodspeed seemed to be the lead investigator and the plaintiff's designated arresting officer.

24.     In addition to other police officers, Puleo, Pierre, Roberts and Haber assisted in the investigations which were supervised by Lieutenant Dennis Klein [Tax Reg. # 896847] ("Klein").

25.     Plaintiff did not have any prior knowledge that he was the subject of the investigations.

26.     Plaintiff did not have any prior knowledge of the arrest and/or basis for the arrest.

The August 31, 2013, incident

27.     It appears that Mr. Simmons was killed by a single gunshot on August 31, 2013, at approximately 2:00 a.m., at or within the vicinity of 217-03 Jamaica Avenue, Queens, New York.

28.     Prior to the shooting, the plaintiff, Mr. Simmons, and several other individuals (comprising mostly young men) had congregated in front of a store that is located at the aforesaid address.

29.     Many of the individuals seemed to be friends or were familiar with each other.

30.     Many of the individuals (including Mr. Simmons) had attended a house party at a nearby location which was abruptly shut down apparently due to fighting.

31.     The individuals then left the party and congregated at the aforesaid location of the incident which seems to be a convenience store.

32.     It is not clear as to the reason why the fight broke out at the party.

33.     It is also not clear as to the identity of the individuals who were involved in the fight at the party.

34.     It appears however that there were plenty of drugs and alcohol involved, and many of the individuals (including, but not limited to, Mr. Simmons) might have been drunk and/or under the influence of drugs.

35.     Some of the witnesses indicate that Mr. Simmons was involved in many of the fights with at least one of the witnesses stating a few hours after the

shooting that Mr. Simmons "WAS TRYING TO PROVOKE FIGHTS WITH RANDOM PEOPLE IN THE STREET BECAUSE HIS COUSIN WAS SLASHED AT AN EARLIER PARTY."

36.     Mr. Simmons did also allegedly try to break up a fight between Marlon Oscar and Shana Graham immediately prior to the shooting.

37.     It appears that Mr. Simmons was shot and killed moments after he stepped away from Messrs. Oscar and Graham while they were still engaged in a heated argument.

**NYPD immediately named the plaintiff as the suspect of the shooting**

38.     Initially, the named individual defendants including, but not limited to, Puleo, Roberts, Pierre and Haber were familiar with the plaintiff as each and every one of them directly participated in the plaintiff's arrest on April 9, 2012, in connection with two unrelated purported robbery incidents which allegedly occurred on January 25, 2012 and February 22, 2012, respectively.

39.     On August 31, 2013, at approximately 1.15 p.m., within a few hours after the shooting, NYPD immediately named the plaintiff as the suspect and began a campaign to frame him as the perpetrator of the homicide.

40.     Prior to that time, no witness had identified the plaintiff as a suspect and/or perpetrator of the shooting.

41.     However, on August 31, 2013, at approximately 1.15 p.m., Haber and Roberts watched a surveillance video obtained from the aforesaid convenience store showing the plaintiff and some of the other individuals who had congregated in front of the store at the time of the shooting.

42.     Haber and Roberts recognized the plaintiff from the video and noted that they had arrested the plaintiff for gunpoint robbery in the past.

43.     Haber and Roberts then advised the other named individual defendants to name the plaintiff as the suspect and/or perpetrator of the shooting.

44.     Thereafter, on August 31, 2013, at approximately 3.45 p.m., Puleo officially named the plaintiff as the suspect and/or perpetrator of the shooting.

45.     Klein later verified and/or approved Puleo's designation of the plaintiff as the suspect and/or perpetrator of the shooting.

46.     On August 31, 2013, at approximately 3.15 p.m., just prior to naming the plaintiff as the suspect and/or perpetrator of the shooting, Puleo contacted an officer of the U.S. Customs and Boarder Protection named Officer Costanza by telephone and informed him that the plaintiff was the suspect and/or perpetrator of the shooting.

47.     Puleo then provided Officer Costanza with the plaintiff's personal details and requested the U.S. Customs and Boarder Protection to conduct a search of the plaintiff and to place the plaintiff on their no fly list.

48.     Officer Costanza proceeded to perform a search of the plaintiff and determined, on the basis of the search, that the plaintiff was a "NO HIT FOR TRAVEL".

49.     After informing Puleo that the plaintiff was a no hit for travel, Officer Costanza proceeded to place the plaintiff on a no fly list and advised Puleo that he and his office would be contacted by the U.S. Customs and Boarder Protection should the plaintiff attempt to travel out of the country.

50.     As with the naming of the plaintiff as the suspect and/or perpetrator of the shooting, Klein verified and/or approved of the placement of the plaintiff on the no fly list.


NYPD began a campaign to frame the plaintiff as the perpetrator of the homicide

51.     Immediately after naming the plaintiff as the sole suspect and/or perpetrator of the shooting and placing his name on the no fly list, defendant officers began to spread word that they had identified the plaintiff as the sole suspect and/or perpetrator of the shooting.

52.     Defendant officers then began spoon-feeding witnesses false information during pre-interviews for repetition in official statements and began to coerce witnesses to falsely implicate the plaintiff.

53.     Defendant officers also falsified some of the witnesses' statements.

54.     Mr. Oscar who was allegedly heavily drunk and/or under the influence of drugs and was engaged in physical and verbal altercation with Mr. Graham at the time of the shooting was initially interviewed by Pierre on September 1, 2013, at approximately 2:00 p.m.

55.     Mr. Oscar was clear at the time of his initial interview that he merely looked over after the shooting and realized that Mr. Simmons had been shot.

56.     Mr. Oscar went on to state that he then saw other people running after the shooting and that he himself immediately left the scene and went home.

57.     Mr. Oscar did not indicate in any fashion that he observed the shooter at anytime nor did he indicate that he knew the identity of the shooter.

58.     Mr. Graham who was engaged in physical and verbal altercation with Mr. Oscar at the time of the shooting was also interviewed by Pierre on September 1, 2013, at approximately 5:00 p.m.

59.     As with Mr. Oscar, Mr. Graham did not indicate in any fashion that he observed the shooter at anytime nor did he indicate that he knew the identity of the shooter.

60.     An eyewitness named Enrique Rocha was also interviewed by defendants on September 1, 2013, at approximately 2:40 p.m.

61.     Mr. Rocha indicated that he was standing close to Messrs. Oscar and Graham at the time of the shooting, that they were a little removed from the other group of individuals at the location of the shooting, and that he was particularly focused on Messrs. Oscar and Graham as they continued to engage in physical and verbal altercation.

62.     As with Messrs. Oscar and Graham, Mr. Rocha stated that he immediately turned around after hearing the gunshot.

63.     Mr. Rocha was clear that he did not see the shooter but merely saw people running, and that he himself ran away.

64.     On October 30, 2013, nearly two months after Mr. Oscar's initial statement and long after defendant officers had started pressuring witnesses (including, but not limited to, Mr. Oscar) to implicate the plaintiff, Mr. Oscar provided defendants with another statement inculpating the plaintiff.

7

65.     Initially, Mr. Oscar provided Goodspeed with a handwritten statement alleging, among other things, that he turned around after hearing the shot and observed Mr. Simmons down on the ground and the plaintiff "running away with a gun on his hand."

66.     Not satisfied, Goodspeed continued to pressure Mr. Oscar.

67.     Mr. Oscar then changed his statement yet again.

68.     Instead of standing by his false assertion that he turned around after hearing the shot and observed Mr. Simmons down on the ground and the plaintiff running away with a gun on his hand, Mr. Oscar turned around and now added at the bottom of the sheet after what appeared to be his signature that he allegedly "heard the shot then saw []¹ pointin[g] the gun in [Mr. Simmons'] [d]irection."

69.     According to Goodspeed, Mr. Oscar first provided him with an oral statement and then proceeded to document his oral statement in what appears to be his own handwriting immediately after which he affixed his signature and printed his name.

70.     Not still satisfied, Goodspeed proceeded to falsely allege in his Complaint Follow Up Informational Report ("DD-5") documenting his purported October 30, 2013 re-interview of Mr. Oscar that he was informed by Mr. Oscar that the plaintiff and Mr. Simmons had a verbal dispute prior to the shooting.

71.     Mr. Oscar, however, did not indicate in his aforesaid handwritten statement that he observed Mr. Simmons and the plaintiff engage in any verbal or physical altercation prior to the shooting.

72.     Indeed, Mr. Oscar could not have observed any such altercation as it is clear from the account of several witnesses that he and Mr. Graham were separated from the other individuals and were engaged in physical and verbal altercation immediately prior to the shooting.

73.     Notwithstanding the above, Klein continued to verify and/or approve the investigations, and also verified and/or approved Goodspeed's DD-5

---

¹ The individual's name seems to be crossed out in the document.

documenting his purported re-interview of Mr. Oscar for accuracy and completeness.

74.     As with Goodspeed, Pierre in his DD-5 documenting his purported September 2, 2013 interview of another witness named Christopher Noels also falsified information allegedly provided to him by Mr. Noels.

75.     Mr. Noels in a purported handwritten note allegedly documenting his oral statement to Pierre stated that he noticed that Mr. Simmons prior to the shooting was drunk, and that he allegedly overheard Mr. Simmons challenge the plaintiff to a physical fight but the plaintiff refused.

76.     Mr. Noels then stated that Messrs. Oscar and Graham started fighting immediately after the plaintiff turned down Mr. Simmons' challenge, and that he began to watch the fight between Messrs. Oscar and Graham.

77.     Mr. Noels further stated that while watching the fight between Messrs. Oscar and Graham, he allegedly heard a gunshot, saw Mr. Simmons' "body drop", then saw the plaintiff "pull something back which looked like a firearm", and that the plaintiff then ran away.

78.     Mr. Noels' aforesaid statement is obviously far from the truth as the general consensus is that Mr. Simmons was involved in some form in the physical altercation between Messrs. Oscar and Graham.

79.     Even Mr. Oscar informed Pierre during his initial interview on September 1, 2013, that Mr. Simmons helped to break up the physical altercation between him and Mr. Graham.

80.     In any event, Pierre falsified the record and provided a statement in his DD-5 that is materially different from Mr. Noels' handwritten statement.

81.     While Mr. Noels did not categorically state that he observed the plaintiff with a firearm nor did he indicate that the plaintiff claimed to be a shooter, Pierre falsely alleged in his aforesaid DD-5 that he was informed by Mr. Noels that he allegedly overheard the plaintiff claim at some point that he was "a shooter" not "a fighter".

82.     Pierre further falsely alleged in his aforesaid DD-5 that he was informed by Mr. Noels that after he allegedly heard a "loud bang", he looked in the

direction of the sound and observed the plaintiff "holding a firearm and standing behind" Mr. Simmons, and that he observed the plaintiff allegedly "put the firearm in his pants" and then run away.

Defendant officers met with prosecutors

83.     Upon information and belief, defendant officers including, but not limited to, Goodspeed, Puleo, Roberts, Pierre, and Haber later forwarded to the prosecutors their falsified records and coerced witness statements, and also promoted Mr. Oscar as a grand jury witness to the prosecutors despite knowing that he had already lied about the plaintiff's involvement in the shooting.

84.     Relying upon the falsified records and coerced witness statements, the prosecutors initiated criminal actions against the plaintiff and presented the charges against him directly to the grand jury.

85.     Mr. Oscar testified in the grand jury as the main prosecution witness.

86.     Mr. Oscar, who the record shows to be a habitual liar, unsurprisingly changed his story yet again.

87.     In addition to other things, Mr. Oscar who had allegedly informed Pierre that Mr. Simmons helped break up the physical altercation between him and Mr. Graham just prior to the shooting testified in the grand jury that he allegedly broke up -- or attempted to break up -- a purported verbal altercation between Mr. Simmons and the plaintiff prior to the shooting.

88.     Additionally, Mr. Oscar who had allegedly informed Goodspeed that his fight with Mr. Graham was "nonsense and being disrespected by [Mr. Graham]" testified in the grand jury that he actually fought with Mr. Graham because Mr. Graham was allegedly not happy that he tried to break up the purported verbal altercation between Mr. Simmons and the plaintiff -- that Mr. Graham "initially wanted to see something happen that night", and that he was essentially helping to break up "a potential 'show' for him."

89.     Mr. Oscar who by the account of several witnesses was heavily drunk and/or under the influence of drugs denied being drunk and testified in the grand jury that he did not take any drugs.

90.     While other police witnesses seemed to indicate that Mr. Simmons and the plaintiff were familiar with each other -- and even Mr. Oscar did testify that he, Mr. Simmons, and the plaintiff all went to the same high school and seemed to know each other from high school -- Mr. Oscar testified in the grand jury that Mr. Simmons was angry with the plaintiff because he did not know him and that Mr. Simmons and the plaintiff "had hostilities toward each other at [the] location."

91.     According to Mr. Oscar, Mr. Simmons looked at all the individuals who were at the location of the shooting that he didn't know or was not familiar with "like the enemy automatically."

92.     Mr. Oscar who by his account to both Pierre and Goodspeed, as well as by the account of several witnesses, was still engaged in at least verbal altercation with Mr. Graham at the time of the shooting testified in the grand jury that the fight between him and Mr. Graham had ended and that he was in front of the store trying to drink "a Corona" at the time of the shooting.

93.     More importantly, Mr. Oscar testified in the grand jury that after the shooting, he looked and saw the plaintiff "with his hands out and like basically pointing and he ran, basically."

94.     When asked whether he saw anything in the plaintiff's hands, Mr. Oscar answered affirmatively and testified that he allegedly saw a gun in the plaintiff's hands, and that the plaintiff was the only individual he allegedly saw with a gun after the shooting.

95.     Mr. Oscar who had earlier testified that Mr. Simmons was allegedly the one who had problems with the plaintiff because he did not know him and saw him as an enemy went on to testify that he allegedly overheard Mr. Simmons challenge the plaintiff to a physical altercation and that he saw Mr. Simmons go up to the plaintiff and allegedly said to him; "if you have a problem with me, come around the corner."

96.     Mr. Oscar who by his own account and that of several witnesses was engaged in physical and verbal altercation with Mr. Graham both prior to and at the time of shooting and did not seem to be aware of his surroundings, further testified in the grand jury that he allegedly saw the plaintiff's hands "on his pants, his pants picking up his pants" just prior to the shooting.

The grand jury indictment

97.     On or about January 9, 2014, the grand jury relying on defendant officers' falsified records, coerced witness statements, and the testimony of Mr. Oscar -- a well rehearsed liar who was promoted by defendant officers -- returned a true bill of indictment charging plaintiff with N.Y. PL 125.25(1) 'Murder in the second degree', N.Y. PL 265.03(3) 'Criminal possession of a weapon in the second degree', and N.Y. PL 265.03(1)(b) 'Criminal possession of a weapon in the second degree'.

98.     On or about January 10, 2014, Goodspeed issued and/or modified an Investigation Card ("I-Card") for the plaintiff's arrest, which was verified and/or approved by Klein for accuracy and completeness.

99.     Defendant officers subsequently obtained an indictment warrant issued by the criminal court.

100.    Plaintiff was subsequently arrested under the indictment warrant on or about February 4, 2014, at approximately 9:00 a.m.

101.    Plaintiff, however, did not commit any murder, was not in possession of any weapon, and did not commit any offense against the laws of New York City and/or State for which any arrest may be lawfully made.

102.    Prior to the arrest, plaintiff had entered an appearance in the New York State Supreme Court, County of Bronx, on an unrelated criminal matter when defendant officers from NYPD-105th Precinct and Queens County Violent Felony Squad suddenly approached him, arrested him, and transported him to NYPD-105th Precinct.

103.     Goodspeed is identified as the plaintiff's arresting officer in the paperwork and seemed to have testified at the trial.

104.     Following the arrest, plaintiff was remanded without bail.

105.     Plaintiff was incarcerated for several years thereafter.

106.     Unlike other witnesses who defendant officers sought out and interviewed, defendant officers did not appear to make any effort to seek out and/or interview the plaintiff concerning the shooting at any time prior to the January 9, 2014 indictment.

Mr. Oscar recanted his statements and testimony

107.     Upon information and belief, Mr. Oscar at sometime in or about December 2014, recanted his statements and testimony in the grand jury.

108.     This is no surprise as it is clear that Mr. Oscar lied in his conflicting statements to defendant officers and in his testimony in the grand jury.

Plaintiff was tried and found not guilty

109.     On or about November 21, 2016, a jury trial was commenced on four charges against the plaintiff under N.Y. PL 125.25(1) 'Murder in the second degree', N.Y. PL 125.20(1) 'Manslaughter in the first degree', N.Y. PL 265.03(3) 'Criminal possession of a weapon in the second degree', and N.Y. PL 265.03(1)(b) 'Criminal possession of a weapon in the second degree'.

110.     On or about December 7, 2016, following the jury trial, plaintiff was found not guilty of the false charges levied against him.

Defendant officers illegally seized plaintiff's properties

111.     At the time of the plaintiff's arrest, defendant officers seized and/or appropriated to themselves several of plaintiff's properties including his two (2) iPhones.

112.     Defendant officers did not provide the plaintiff with any voucher for his said properties.

113.     Defendant officers did not issue or provide the plaintiff with any voucher specifying the properties seized from him with the constitutionally-required notice printed on the voucher describing how the plaintiff could reclaim the aforementioned properties.

114.     Defendant officers did not otherwise notify the plaintiff of any procedure he could follow to reclaim or recover his properties, and have refused to return the aforesaid properties including the two (2) iPhones to the plaintiff.

115.     In addition to other things, defendant officers widely publicized in the news media that the plaintiff was arrested and charged with the murder of Mr. Simmons.

The plaintiff's April 9, 2012 arrest

116.     As noted above, the plaintiff and the defendant officers -- including, but not limited to, Puleo, Roberts, Pierre and Haber -- are not strangers to each other as defendant officers had previously arrested the plaintiff in a similar manner as here, and did at the time make it clear to him that they were out to get him.

117.     On or about April 9, 2012, at approximately 1:00 p.m., Roberts, Pierre, an unknown officer of the NYPD, and approximately four unknown officers of the New York City Department of Correction ("NYCDOC"), acting in concert, arrested the plaintiff without cause at or within the vicinity of Eric M. Taylor Center which is located at 10-10 Hazen Street, East Elmhurst, New York, and charged plaintiff with N.Y. PL 160.15(4) 'Robbery in the

first degree', and PL 160.05 'Robbery in the third degree', among other charges.

118.    Plaintiff, however, did not commit any robbery, was not in possession of any weapon, and did not commit any offense against the laws of New York City and/or State for which any arrest may be lawfully made.

119.    Upon information and belief, plaintiff was arrested by defendant officers in connection with two unrelated robbery incidents which allegedly occurred on January 25, 2012 and February 22, 2012, respectively.

120.    Upon information and belief, the alleged February 22, 2012 robbery occurred on said date at approximately 6:45 p.m.

121.    Upon information and belief, an individual identified by defendants as Fidel Sue was the alleged victim of the January 25, 2012, robbery incident.

122.    Upon information and belief, an individual identified by defendants as Besiki Svanidize was the alleged victim of the February 22, 2012, robbery incident.

123.    Upon information and belief, an individual identified by defendants as Koba Koberidze allegedly witnessed the February 22, 2012, robbery incident.

124.    At all times material, plaintiff was not positively identified as the perpetrator of any of the aforementioned robberies by any individual identified by defendants as a victim or witness to the said robberies including, but not limited to, Sue, Svanidize and Koberidze.

125.    Upon information and belief, Sue did not provide defendants with any information concerning the individual who perpetrated the January 25, 2012, robbery, and did not provide defendants with any description of the said perpetrator.

126.    Upon information and belief, Koberidze did not provide defendants with any information concerning the individual who perpetrated the February 22, 2012, robbery, and did not provide defendants with any description of the said perpetrator.

127.    Although Svanidize provided a partial description of the individual who allegedly perpetrated the February 22, 2012, robbery, Svanidize informed defendants that he did not have a good look at the individual because it was

dark outside, the perpetrator wore a hoodie which masked his face, the robbery happened so fast, and that he and his friend, Koberidze, were scared at the time.

128.    Notwithstanding the above, defendants immediately identified the plaintiff as a suspect and framed the plaintiff as the perpetrator of the said robbery.

129.    Immediately after identifying the plaintiff as a suspect, defendants promptly arranged a photo array with the plaintiff identified as the subject.

130.    Defendants included five fillers in the photo array.

131.    Defendants then proceeded to show the photo array to Koberidze on February 22, 2012, at approximately 8:45 p.m.

132.    Koberidze did not identify the plaintiff as the perpetrator of the alleged robbery.

133.    Immediately after viewing the photo array of the same day, Koberidze duly informed defendants that he wasn't sure about the identity of the perpetrator of the alleged robbery and that he did not want to get the wrong guy sentenced to jail for 10 years.

134.    Prior to the viewing of the photo array by Koberidze, defendants had interviewed Svanidize and conducted a photo manager session with Svanidize.

135.    Svanidize did not identify the plaintiff as the perpetrator of the alleged robbery.

136.    As with Koberidze, Svanidize promptly informed defendants that he wasn't sure about the identity of the perpetrator because it was dark outside, the perpetrator wore a hoodie which masked his face, the robbery happened so fast and that he and Koberidze were scared at the time of the incident.

137.    Despite knowing fully well that the plaintiff was not implicated in the alleged robbery, defendants identified the plaintiff as a suspect and perpetrator, and framed the plaintiff as the perpetrator of the said robbery.

138.    Notwithstanding the fact that neither Svanidize nor Koberidze identified the plaintiff as the perpetrator at anytime, defendants continued to frame the plaintiff as the perpetrator of the alleged February 22, 2012, robbery.

139.    Klein, in his capacity as a supervisor, continued to approve the designation of the plaintiff as a suspect, person of interest and the perpetrator of the alleged February 22, 2012 robbery, and verified the plaintiff's arrest.

140.    Defendants failed to undertake their responsibility to investigate the alleged February 22, 2012 robbery.

141.    On February 29, 2012, Haber falsely stated that Koberidze had identified the plaintiff to him as the perpetrator of the alleged February 22, 2012, robbery.

142.    Upon information and belief, neither Svanidize nor Koberidze is (or was) familiar with the plaintiff in any manner.

143.    Because neither Svanidize nor Koba is (or was) familiar with the plaintiff in any manner, the only way either one of them could have positively identified the plaintiff to Haber was by pointing him out -- whether in a photo array, lineup or show-up.

144.    At all times material, Haber did not conduct any identification procedure.

145.    Moreover, Koberidze did not identify the plaintiff as the perpetrator after viewing the February 22, 2012, photo array because he wasn't sure about the identity of the perpetrator.

146.    Accordingly, Haber could not have reasonably relied upon the February 22, 2012, photo array procedure.

147.    Klein knew or should have known that the plaintiff was not identified at any time by any individual as a suspect in any criminal conduct.

148.    Klein knew or should have known that there was no reasonable basis or probable cause to name or designate the plaintiff as a person of interest or perpetrator.

149.    Despite the above, Klein authorized the issuance of an I-Card authorizing his subordinates to interrogate and/or question the plaintiff, and verified the plaintiff's arrest.

150.    Notwithstanding the fact that the plaintiff was not implicated in any of the robberies described above, on April 7, 2012, Puleo directed NYCDOC to hold and detain the plaintiff after he had finished serving his 5-day sentence for unlawful possession of marihuana.

151.    Puleo did not obtain any court order or valid legal process directing the continued detention of the plaintiff past his aforesaid 5-day sentence.

152.    Subsequently, Roberts, Pierre, and the unknown officer of the NYPD, arrested the plaintiff without cause on April 9, 2012, immediately after he had finished serving his sentence.

153.    After falsely arresting the innocent plaintiff, Roberts, Pierre, and the unknown officer of the NYPD physically assaulted the plaintiff.

154.    Eventually, defendant officers transported the plaintiff to NYPD-105th Precinct.

155.    Upon arriving at the precinct, Roberts, Klein, and other police officers immediately identified the plaintiff as a suspect concerning the January 25, 2012, robbery and proceeded to frame the plaintiff as the perpetrator of the said robbery.

156.    Immediately after identifying the plaintiff as the suspect, Roberts promptly arranged a lineup with the plaintiff identified as the subject.

157.    Roberts included five fillers in the lineup.

158.    Roberts then invited Sue to view the lineup on April 9, 2012, at approximately 9:50 p.m.

159.    Upon information and belief, the lineup was conducted by Roberts and was supervised by Klein.

160.    Sue did not identify the plaintiff as the perpetrator.

161.    Immediately after viewing the lineup of the same day, Sue duly informed defendant officers that the perpetrator of the January 25, 2012, robbery was not in the lineup.

162.    Notwithstanding the above, defendants detained continued to detain the plaintiff at the precinct.

163.    Eventually, after detaining the plaintiff at the precinct for a lengthy period of time, plaintiff was transported to the Central Booking to await arraignment.

164.    While plaintiff was awaiting arraignment, Roberts met with prosecutors employed by the Queens County District Attorney's Office.

165.     Upon meeting with the prosecutors, the prosecutors indicated that the plaintiff should be released from his unlawful detention in the absence of any information indicating that the plaintiff was positively identified as a suspect in any criminal conduct.

166.     Even though the plaintiff was never identified at any time material as a suspect in any crime, defendant officers continued to detain the plaintiff.

167.     Eventually, Roberts acting in concert with the other police officers falsely stated to the prosecutors, among other things, that the plaintiff forcibly stole certain property while displaying a firearm or weapon, and was identified by an eyewitness in a photo array which was allegedly conducted on February 22, 2012.

168.     Based on the false testimony of the NYPD officers, a prosecution was commenced against the plaintiff.

169.     Following plaintiff's arraignment, bail was set in the amount of $75,000 to secure his release.

170.     Because plaintiff could not make bail, plaintiff was transported to Rikers Island, and was incarcerated at said facility for several months.

171.     Several months after he was detained by defendants as a pretrial detainee awaiting trial, plaintiff was placed in yet another lineup conducted by defendants and viewed by Svanidize.

172.     Svanidize yet again failed to identify the plaintiff as the perpetrator.

173.     Upon information and belief, the lineup was conducted by Haber and three unknown police officers, and was supervised by Klein.

174.     As the plaintiff was being led away from the lineup in handcuffs and restraints, the police officers involved in the lineup physically and verbally assaulted the plaintiff.

175.     Defendants ceaselessly threatened and taunted the plaintiff and made several derogatory comments concerning the plaintiff.

176.     At some point, the NYPD officers involved in the lineup stated that the plaintiff was lucky that he was not picked out of the lineup.

177.     Haber categorically stated that they would make sure that they get the plaintiff incarcerated for the rest of his life the next time they come into contact with him.

178.     In the face of the threats and abuse by the officers, plaintiff merely indicated that the officers were abusing their authority.

179.     In retaliation, the individual officers grabbed the plaintiff and placed him in a chokehold.

180.     Upon information and belief, the assault was captured on a camera that is located at the precinct where the lineup was conducted.

181.     Eventually, on or about November 13, 2012, the false charge(s) levied against plaintiff were summarily dismissed.

182.     Following the dismissal of the false charge(s) against him, the plaintiff was released from detention by defendants after approximately seven (7) months of unlawful incarceration.

183.     On or about February 6, 2014, plaintiff timely commenced an action in this Court against defendant officers under Docket # 14 CV 816 (SJ) (VMS), in connection with the aforesaid April 9, 2012 arrest and incarceration.

184.     The plaintiff's case in connection with the April 9, 2012 arrest was summarily dismissed and closed in this district on August 22, 2019, which decision the plaintiff intends to appeal. *See Kroutchev Demosthene v. City of New York*, No. 14 CV 816 (EDNY).

Plaintiff suffered and continues to suffer

185.     As a result of the aforesaid actions by defendants, plaintiff suffered and continues to suffer emotional distress, fear, embarrassment, humiliation, shock, discomfort, loss of liberty, loss of rights to familial association, wages and financial losses, pain and damage, and damage to reputation.

<u>FIRST CAUSE OF ACTION: § 1983 (MALICIOUS PROSECUTION)</u> - against
<u>defendant officers including Goodspeed, Puleo, Roberts, Pierre, and Haber</u>

186.    By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 185 of this complaint as though fully set forth herein.

187.    Defendant officers forwarded to the prosecutors their falsified records and coerced witness statements, and also promoted Mr. Oscar as a grand jury witness to the prosecutors despite knowing that he had already lied about the plaintiff's involvement in the shooting.

188.    Relying upon the falsified records and coerced witness statements, the prosecutors initiated criminal actions against the plaintiff and presented the charges against the plaintiff directly to the grand jury.

189.    Relying on defendant officers' falsified records, coerced witness statements, and the testimony of Mr. Oscar -- a well rehearsed liar who was promoted by defendant officers despite knowing fully well that he had lied -- the grand jury returned a true bill of indictment against the plaintiff.

190.    Defendant officers subsequently obtained an indictment warrant issued by the criminal court which they allegedly relied upon to arrest the plaintiff.

191.    Following the arrest, plaintiff was remanded without bail.

192.    Plaintiff was incarcerated for several years thereafter.

193.    Plaintiff was required to, and did, appear in court on multiple occasions to defend himself from the false charges levied against him with malice by defendants.

194.    On or about December 7, 2016, the plaintiff was tried and found not guilty of the false charges levied against him.

195.    Subsequently, following his acquittal, the plaintiff was released from his nearly three (3) years unlawful incarceration.

196.    Because of the conduct of the defendants, plaintiff was maliciously prosecuted for a lengthy period of time.

197.    The conduct of defendant officers, as described herein, amounted to malicious prosecution.

198.   Such conduct described herein violated plaintiff's rights under 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

199.   Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

SECOND CAUSE OF ACTION: FABRICATION OF EVIDENCE - against defendant officers including Goodspeed, Puleo, Roberts, Pierre, and Haber

200.   By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 199 of this complaint as though fully set forth herein.

201.   Defendant officers manufactured evidence of criminality against the plaintiff which the prosecutors relied upon to initiate criminal actions against the plaintiff.

202.   The conduct of defendant officers, as described herein, amounted to fabrication of evidence.

203.   Such conduct described herein violated plaintiff's rights under 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

204.   Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

THIRD CAUSE OF ACTION: TORTS (FALSE ARREST/IMPRISONMENT) - against defendants

205.   By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 204 of this complaint as though fully set forth herein.

206.   Defendants arrested the plaintiff without probable cause or reasonable grounds.

207.   The conduct of the defendants, as described herein, amounted to false arrest/imprisonment.

208.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

FOURTH CAUSE OF ACTION: TORTS (MALICIOUS PROSECUTION) - against defendants

209.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 208 of this complaint as though fully set forth herein.

210.     Based on defendants officers' falsified records and coerced witness statements, the prosecutors initiated criminal actions against the plaintiff.

211.     Based on defendant officers' falsified records, coerced witness statements, and the false testimony of Mr. Oscar who was promoted to prosecutors to testify in the grand jury by defendant officers, the grand jury returned a true bill of indictment against the plaintiff.

212.     Plaintiff was required to, and did, appear in court on multiple occasions to defend himself from the false charges levied against him with malice by defendants.

213.     Eventually, the criminal proceeding(s) terminated in plaintiff's favor.

214.     Because of the conduct of the defendants, plaintiff was maliciously prosecuted for a lengthy period of time.

215.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

FIFTH CAUSE OF ACTION: TORTS (REPLEVIN & CONVERSION) - against defendants

216.     By this reference, plaintiff incorporates each and every allegation and averment set forth in paragraphs 1 through 215 of this complaint as though fully set forth herein.

217.     At the time of the plaintiff's arrest, defendant officers seized and/or appropriated to themselves several of plaintiff's properties including his two (2) iPhones.

218.     Defendant officers did not provide the plaintiff with any voucher for his said properties.

219.     Defendant officers did not issue or provide the plaintiff with any voucher specifying the properties seized from him with the constitutionally-required notice printed on the voucher describing how the plaintiff could reclaim the aforementioned properties.

220.     Defendant officers did not otherwise notify the plaintiff of any procedure he could follow to reclaim or recover his properties, and have refused to return the aforesaid properties including the two (2) iPhones to the plaintiff.

221.     Consequently, plaintiff has been damaged and hereby demands compensatory and punitive damages in an amount to be proven at trial against each of the defendants, individually and severally.

WHEREFORE, plaintiff respectfully prays judgment as follows:

a.     For compensatory damages against all defendants in an amount to be proven at trial;

b.     For exemplary and punitive damages against all defendants in an amount to be proven at trial;

c.     For costs of suit herein, including plaintiff's reasonable attorney's fees; and;

d.     For such other and further relief as the court deems proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury.

Dated: Brooklyn, New York
      August 30, 2019

                UGO UZOH, P.C.

By:    Ugochukwu Uzoh
        Attorney for the Plaintiff
        56 Willoughby Street, Third Floor
        Brooklyn, N.Y. 11201
        Tel. No: (718) 874-6045
        Fax No: (718) 576-2685
        Email: u.ugochukwu@yahoo.com